Argued and submitted February 22, resubmitted en banc September 13, 2006, affirmed January 24, petition for review allowed May 22, 2007 (342 Or 727)

STATE OF OREGON,
*Respondent,*

*v.*

CESAR RODRIGUEZ-CASTILLO,
*Appellant.*

030872; A122360

151 P3d 931

Jamesa J. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Kaye Ellen McDonald, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, and Rosenblum, Judges.

ROSENBLUM, J.

Edmonds, J., concurring.

Brewer, C. J., dissenting.

Wollheim, J., dissenting.

## ROSENBLUM, J.

Defendant was charged with a number of offenses including eight counts of first-degree sexual abuse. ORS 163.427.[1] A jury convicted him only on Count 7, first-degree sexual abuse, and acquitted him of the remaining charges. On appeal, defendant contends that the trial court erred in two respects: in admitting the hearsay testimony of a police detective concerning statements that the victim made to him through an interpreter, and in failing to instruct the jury that 10 or more of its members must agree on the same set of underlying facts to convict him of any particular count in the indictment. We affirm.

We take the following undisputed facts from the record. Defendant and the victim are cousins, and both speak Spanish as their first language. The victim moved to the United States from Mexico in 2000 and, in the summer of 2002, went to live, along with her father and two brothers, with defendant and his family. The victim was 13 years old at the time. Sometime later that summer, defendant and his family moved out of the home and relocated temporarily to California. They returned to the home in October 2002. The events leading to defendant's trial and conviction occurred when the victim's family and defendant's family lived together, before defendant and his family moved to California.

Sometime after defendant returned from California, the victim told her friend Rosales and Rosales's mother, Cortes, that someone had touched her all over her body and raped her. Cortes told the victim that she should talk to her family about it. The victim then told her aunt that defendant had raped her. Her aunt explained to her what it means to be

---

[1] ORS 163.427 provides, in part:

"(1) A person commits the crime of sexual abuse in the first degree when that person:

"(a) Subjects another person to sexual contact and:

"(A) The victim is less than 14 years of age;

"(B) The victim is subjected to forcible compulsion by the actor; or

"(C) The victim is incapable of consent by reason of being mentally defective, mentally incapacitated or physically helpless[.]"

raped and asked her if she was sure. The victim then told her that it had not been rape but that defendant had touched her.

In December 2002, the victim disclosed to a tutor at her school, Perez, that someone had touched her "where they're not supposed to." The police were notified. Detective Lane interviewed the victim twice. He also interviewed defendant twice. We recount the substance of those interviews at some length below. Based on the victim's disclosures to him, Lane arranged for the victim to be examined and interviewed at CARES Northwest, a child abuse assessment center. The examination revealed no physical signs of abuse, but the victim told the examining nurse and a social worker at the center, Burton, that defendant had touched her genital area twice.

Defendant was charged with one count of unlawful sexual penetration in the first degree; one count of unlawful sexual penetration in the second degree; eight counts of sexual abuse in the first degree; and one count of private indecency. At the beginning of the jury selection process in defendant's trial, the court read the indictment to the potential jurors. All charges were based on incidents that were alleged to have occurred between December 2001 and August 2002. With respect to the sexual abuse charges, the indictment alleged that, on two "separate and distinct" occasions, defendant touched the victim's breasts and vagina.[2] For each act, the state charged two counts, one alleging that the victim

___

[2] Counts 4 and 7 of the indictment set forth the two "separate and distinct" occasions of sexual abuse involving touching the victim's vagina while she was under the age of 14:

"COUNT 4: SEXUAL ABUSE IN THE FIRST DEGREE (ORS 163.427 F/B) The said defendant, on a date on or between December 1, 2001, and August 31, 2002, in the County of Lincoln and State of Oregon, did unlawfully and intentionally subject [the victim], a person under the age of 14 years, to sexual contact by touching her vagina, a sexual or intimate part of [the victim].

"* * * * *

"COUNT 7: SEXUAL ABUSE IN THE FIRST DEGREE (ORS 163.427 F/B) And as an act of the same or similar nature but on an occasion separate and distinct from the acts alleged in Counts 1 through 6 above, [defendant], on a date on or between December 1, 2001, and August 31, 2002, in the County of Lincoln and State of Oregon, did unlawfully and intentionally subject [the victim], a person under the age of 14 years, to sexual contact by touching her vagina, a sexual or intimate part of [the victim]."

was under the age of 14 and one alleging that defendant had subjected the victim to forcible compulsion.[3]

The victim testified at trial that there were three different incidents during which defendant subjected her to sexual contact. Each incident took place in the home that the victim and her family shared with defendant and his family. The victim testified that one incident occurred when she was playing a card game with her brother, defendant, and defendant's family. She testified that, after they finished the game, defendant touched her genital area on the outside of her clothes.

The victim testified further that, on another day, she was sitting on the couch in the living room watching television and defendant was sitting on the floor. According to the victim, her brother was asleep on the other couch and defendant's wife was sleeping in the next room. The victim testified that defendant touched her breasts and put his hand down her pants, touched her vagina, and inserted his fingers inside. She said that he later pulled her into the kitchen, showed her his penis, and told her to touch it.

The victim testified that a third incident occurred on a day when defendant's wife and children were in Salem. She stated that her cousin Martin and her brother had been at the house and that she had been playing outside with them and defendant; Martin later left. According to the victim, while her brother was taking a shower, defendant followed her into her bedroom, pushed her onto her bed, laid on top of her, and touched her breasts. She testified that that night she was watching TV when defendant came home from work, sat next to her, and touched her genital area on top of her clothes.

The state also presented corroborating evidence, primarily in the form of witness testimony, about statements that the victim made to those witnesses about being abused and statements that defendant made during the course of the investigation. Witnesses who testified that the victim had

---

[3] Counts 5, 6, 8, and 10 alleged sexual abuse by touching the victim's breasts, and Counts 3, 4, 7, and 9 alleged sexual abuse by touching her vagina.

told them that defendant had abused her included the victim's friend Rosales, Rosales's mother, the victim's aunt, two school officials, Detective Lane, the CARES nurse who examined the victim, and Burton, the social worker.

As noted, Lane interviewed the victim on two occasions. Lane testified, without objection, to the substance of his initial interview with the victim, which occurred on December 5, 2002, after he was notified by staff at the victim's school that she may have been abused. One of the school's teachers, McCoy, helped interpret the interview. Lane testified that the victim was very hesitant to discuss the abuse; she eventually told him that defendant touched her "some place that made [her] feel uncomfortable," but then "shut down and quit talking."

Lane's second interview with the victim took place on December 9, 2002, with Perez, the victim's bilingual tutor at the school, acting as interpreter. Defendant objected to Lane's testimony concerning that interview on hearsay grounds, but the trial court ruled that the testimony was admissible under OEC 803(18a)(b) as a statement concerning an act of abuse. Lane testified that the victim was more willing to tell him what had happened: "[S]he started talking and information just started flowing out of her." According to Lane, the victim first described the day that defendant's wife had gone to Salem. Lane's testimony about what she said tracked many of the details that the victim gave in her trial testimony, including those about her cousin Martin, the game they played outside, the fact that defendant pushed her onto her bed and touched her breasts while her brother was in the shower, and that defendant touched her genital area later that night after he got home from work.

Lane also testified that the victim had told him about a night on which defendant's wife was sleeping in another room and her brother was asleep on the other couch, and defendant touched her while she was watching TV. According to Lane, the victim told him that defendant touched her breasts and then put his hand "in her pants under her underwear" and touched her on "the inside of her body." Lane testified that the victim also told him that defendant later pulled her into the kitchen, pulled down his pants,

and wanted her to touch his penis. Again, the details reflected the victim's trial testimony.

After Lane testified, the state called Perez as a witness. Perez testified that he had worked for six years as a Spanish language tutor at the victim's school. He also testified that Spanish was his native language and that he spoke the language "quite well." When the prosecutor asked Perez if he had accurately interpreted the conversation between Lane and the victim, he testified, "I think so. I think it's— yeah, as far as I—as far as I know." There was no evidence that Perez was certified as an interpreter or that he had any professional training as an interpreter.

The state also called Burton, the CARES social worker, to testify, and introduced the videotape of her interview with the victim, along with a translated transcript of the interview. The transcript shows that the victim told Burton about the incident in which defendant's wife was in Salem, including some of the details that she told Lane, but, beyond saying that it had happened twice, did not provide any details about any other incident.

The jury also heard testimony about defendant's interviews with the police. Lane testified regarding his first interview with defendant, which occurred on December 6, 2002. According to Lane, defendant denied touching the victim sexually but explained that he sometimes wrestled with the victim and that one time he picked her up and may have inadvertently touched the genital area over her clothes. Defendant was interviewed by the police again on February 11, 2003. That interview was videotaped, and portions of the videotape were played and interpreted for the jury. In the interview, defendant told the officers that, one night, the victim sat down very close to him in the living room when his wife and the rest of the family were asleep in the bedrooms. Defendant said that the victim had put his hand on her stomach under her shirt and that he thought she was only playing, so he started caressing her. He said that, after a couple of minutes, he put his hand into her pants and could feel her pubic hair and the "skin under the hair," but he denied that he touched her genitalia.

Defendant testified in his own defense. He described a night when he and the victim were watching television and she lay down next to him on the couch, grabbed his hand, and put it on her stomach. He testified that he thought she was "just playing." He said that she then "made herself skinny" and pushed his hand into her pants. He testified that he thought he "could have touched the pubic hair." Defendant said that he pulled his hand out immediately. According to defendant, the incident occurred on a night when his wife was home but in the other room sleeping.

In closing argument, the prosecutor explained each of the charges in the indictment, using overhead slides. As to Count 7, she stated, in part:

"The second set of charges, Count 7 through 10, all deal with the day that defendant's wife went to Salem, and [the victim] told you that the day that the defendant's wife went to Salem was the day that they were playing this game of locking each other outside of the house. And on that day, after she got back inside the house, her brother, Jose, went to take a shower, and the defendant followed her into her room and they fell onto the bed. She told Detective Lane she actually pushed her on the bed, but the end result was that she was laying on her back, and the defendant was on top of her and she couldn't get away, and he touched her breasts.

"Later that night, she was watching television with the defendant before her brother and her father came home, although her younger brother, David, was there, and the defendant, at that time, touched her on her vagina. So there's a count of Sex Abuse in the First Degree—two counts of Sex Abuse in the First Degree for touching her breasts by force, and because she was under 14 years of age, and two counts of Sex Abuse in the First Degree for touching her vagina."

After closing arguments, the trial court instructed the jury, in part, as follows:

"This being a criminal case, ten or more jurors must agree upon your verdict. When you've arrived at a verdict, presiding juror will sign the appropriate verdict form. Then at least ten of you that concur in that verdict will also sign it. * * *

"* * * There are 11 verdict forms and you need to sign and return each of them.

"* * * * *

"And just for your benefit, when you get back in there and you look at [the verdict forms], it'll have Count 4, and in parens it'll have her vagina. Count 5 will have—Count 5, and then in parens, her breasts. They're distinguished between the different counts by the act."

The verdict forms for Counts 4 and 7 were identical, each noting in parentheses that the count referred to "(touching her vagina and under age 14)."

The court also instructed the jury as to the elements of each count. With respect to Count 7, the court stated:

"Count 7, Oregon law provides a person commits the crime of Sexual Abuse in the First Degree when the person intentionally subjects another person to sexual contact and the victim is less than 14 years of age. In this case, to establish the crime of Sexual Abuse in the First Degree, the State must prove, beyond a reasonable doubt, the following elements: One, that the act occurred in Lincoln County, Oregon. Two, the act occurred on or between December 1, 2001 and August 31, 2002. Three, [defendant] intentionally subjected [the victim] to sexual contact, and four, that [the victim] was less than 14 years of age."

The court gave an identical instruction with respect to Count 4. Neither defendant nor the state took exceptions to the instructions given, nor did either ask that the jurors be instructed that 10 or more of them must agree on the same set of underlying facts in order to convict defendant of any given count.

The jury convicted defendant on Count 7. It acquitted him on the remaining counts. Defendant appeals from the ensuing judgment of conviction.

In his first assignment of error, defendant argues that Lane's testimony recounting Perez's interpretation of the December 9, 2002, interview with the victim constituted inadmissible hearsay. Specifically, defendant asserts that Lane's testimony about what the interpreter, Perez, told him

that the victim said during the December 9 interview is inadmissible double hearsay, not subject to any exception and, thus, it should have been excluded. The state responds that this court should adopt an "agency" or "language conduit" theory under which the interpreter's statements are treated as if they were made by the original declarant and thus do not constitute an additional level of hearsay. The state argues that, even if we do not adopt that theory, Lane's testimony is properly admissible under the exception for statements concerning sexual abuse, the requirements of existing case law, or the residual hearsay exception in OEC 803(28).

■     We apply a two-part standard of review to an evidentiary ruling that a statement is admissible under an exception to the hearsay rule. *State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006). We will uphold the trial court's preliminary factual determinations if there is any evidence in the record to support them. *Id.* We review for errors of law the trial court's legal conclusion as to whether the statement is admissible under an exception to the hearsay rule. *Id.* Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801. It is inadmissible unless it falls within one of the exceptions set out in OEC 801 to 806 or as "otherwise provided by law." OEC 802. Hearsay within hearsay is admissible only if "each part of the combined statements conforms with an exception set forth in [OEC 803] or [OEC 804]." OEC 805. In this case, the challenged testimony consists of two levels of out-of-court statements that the state offered for the truth of the matters asserted: first, the victim's statements to Perez, and second, Perez's interpretation of the victim's statements to Lane.[4] The focus of defendant's challenge is on Perez's interpretation.[5]

---

[4] We reject without extended discussion the state's argument that Perez's statements were not offered for their truth but, rather, to show that Lane understood what the victim had stated. The state does not explain why that purpose would be relevant. *See* Laird C. Kirkpatrick, *Oregon Evidence* § 801.01[3][d], Art VIII-12 (4th ed 2002) ("An important nonhearsay use of out-of-court statements is to prove their effect upon a person who heard the statement, *where such effect is relevant.*" (Emphasis added.)).

[5] Defendant does not argue that the first level of hearsay in Lane's testimony—that is, the victim's statements to Perez—rendered the testimony inadmissible.

■        We begin our discussion with the ground relied on by the trial court for admitting Lane's testimony, namely, that it was admissible under OEC 803(18a)(b), an exception to the hearsay rule for statements concerning acts of abuse. OEC 803(18a) provides, in part:

"(b)   A statement made by a person concerning an act of abuse as defined in ORS 107.705 or 419B.005 * * * is not excluded by [OEC 802] if the declarant either testifies at the proceeding and is subject to cross-examination, or is unavailable as a witness but was chronologically or mentally under 12 years of age when the statement was made * * *.

"* * * * *

"(c)   This subsection applies to all civil, criminal and juvenile proceedings.

"(d)   This subsection applies to a child declarant, a declarant who is an elderly person as defined in ORS 124.050 or an adult declarant with developmental disabilities."

        The state argues that Lane's recital of Perez's interpretation of the victim's statements was admissible under OEC 803(18a)(b), because the statements concerned acts of abuse and "both Perez and the victim testified at trial and were subject to cross-examination." That argument, however, ignores the plain language of OEC 803(18a)(d), which limits the applicability of subsection (18a), including (18a)(b), to a declarant who is a child, an elderly person, or an adult with developmental disabilities. Here, the relevant declarant was Perez, an adult, and there was no evidence that he was elderly or had developmental disabilities. Thus, the second level of hearsay—Perez's interpretation of the victim's statements—does not fall within the exception of OEC (18a)(b). The trial court erred in admitting Lane's testimony on that ground.

■        Although OEC 803(18a)(b) did not furnish a proper basis for admitting Lane's testimony, the court's ruling was not erroneous if the testimony was admissible on some other ground. Under the "right for the wrong reason" doctrine, we may affirm a trial court ruling, even though the court's legal reasoning for the ruling was erroneous, if (1) the facts in the

record are sufficient to support a proffered alternative basis; (2) the trial court's ruling is consistent with the view of the evidence under the alternative basis; and (3) the record is materially the same as would have been developed had the prevailing party raised the alternative basis for affirmance below. *Outdoor Media Dimensions Inc. v. State of Oregon,* 331 Or 634, 659-60, 20 P3d 180 (2001). We conclude that those requirements are satisfied in this case.

As noted, the state argues that Lane's testimony was admissible under the "agency" or "language conduit" theory. That theory, adopted by several federal circuits, rejects the premise that a translation constitutes an additional layer of hearsay. This court has had previous occasion to consider the agency theory in deciding the admissibility of out-of-court statements made through an interpreter. *See State v. Letterman,* 47 Or App 1145, 616 P2d 505 (1980), *aff'd by an equally divided court,* 291 Or 3, 627 P2d 484 (1981). *Letterman* concerned the testimony of a police officer about his interview with the defendant, a hearing- and speech-impaired person, conducted with the assistance of an interpreter. We noted that the first level of hearsay—the interpreter's translation of the defendant's statements—was admissible as the defendant's admissions. Thus, at issue was whether the second-level statements, that is, the officer's testimony concerning the interpreter's translation of the defendant's statements, were admissible. *Id.* at 1148. After reviewing the cases and commentary that had addressed that question, we declined to adopt the agency theory that the state urges us to reconsider now. *Id.* at 1151.

Nevertheless, we concluded that the testimony was admissible under the "general" common-law hearsay exception described in *Timber Access Ind. v. U. S. Plywood,* 263 Or 509, 503 Pd 482 (1972). *Letterman,* 47 Or App at 1152. *Timber Access Ind.* concerned the admissibility of testimony about an extrajudicial statement made by one of the defendant's employees that the defendant had contracted unconditionally to buy certain logs. Although the statement did not fit within a generally recognized exception to the hearsay rule, the Supreme Court found "an aura of trustworthiness about [the declarant's words] which makes evidence of them admissible." *Timber Access Ind.,* 263 Or at 519. The Supreme

Court deemed the statement trustworthy because the declarant was in a position to know the facts and ordinarily would not make a statement against his interest unless it was truthful. *Id.* at 520. Applying the principles of *Timber Access Ind.* in *Letterman*, we concluded that the interpreter's translation was admissible because it "satisfie[d] the two requirements common to most, if not all, of the exceptions to the hearsay rule: (1) circumstantial guarantees of trustworthiness, and (2) necessity for use of the out-of-court statement." *Letterman*, 47 Or App at 1151.

However, our decision in *Letterman* predated the enactment of the Oregon Evidence Code.[6] Therefore, it is necessary to consider the effect of that enactment on the exception announced in *Letterman*. As noted, in *Letterman*, we applied a common-law "general" exception to the hearsay rule and concluded that the interpreter's translation in that case was admissible. The legislature later enacted OEC 802, which provides that "[H]earsay is not admissible except as provided in [OEC 801] to [OEC 806] or as otherwise provided by law." Thus, we must discern whether, by using the phrase "or as otherwise provided by law" in OEC 802, the legislature intended to preserve the common-law exception stated in *Letterman*. When construing a statute, we begin with the text in context and, if necessary, resort to legislative history and other aids to construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).

We conclude that the phrase "otherwise provided by law" is ambiguous. In particular, the intended scope of the term "law" is not clear. It is not clear whether the legislature intended for the term to encompass statutory law, constitutional law, and common law, or a limited subset thereof. In other words, we are unable to determine whether the legislature intended to preserve preexisting common-law hearsay principles, including the *Letterman* framework for evaluating the admissibility of hearsay statements made through an interpreter, that are not provided for statutorily. It is equally plausible to read the rule as encompassing the common law and to read it as excluding the common law. Because the rule

---

[6] The Oregon Evidence Code was enacted in 1981. Or Laws 1981, ch 892, §§ 1-78.

is capable of more than one plausible interpretation, and we have discerned no contextual solution to that dilemma, it is ambiguous.

We, therefore, turn to the pertinent legislative history, beginning with the Legislative Commentary. *See State ex rel OHSU v. Haas*, 325 Or 492, 506 n 10, 942 P2d 261 (1997) ("Legislative Commentary on the Oregon Evidence Code should be considered as part of that Code's legislative history."). The commentary resolves the ambiguity:

> "[OEC 802] is a modified version of Rule 802 of the Federal Rules of Evidence. Like the federal rule, it considers Rules 801 through 806 to contain the primary list of hearsay exceptions, but recognizes that the admission of hearsay evidence may be allowed by specific sections of the Oregon Revised Statutes outside the Evidence Code. In any event, the Legislative Assembly intends that hearsay only be admitted pursuant to some statutory or constitutional authority."

Legislative Commentary to OEC 802, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 802.02, Art VIII-51 (4th ed 2002). The express reference to "statutory or constitutional authority" leaves no doubt as to the legislature's intent with respect to the continuing vitality of common-law exceptions to the hearsay rule. To the extent that the hearsay exceptions announced in *Timber Access Ind.* and in *Letterman* are less stringent than statutory or constitutional requirements for admissibility, we conclude that the legislature abrogated them.[7] *See* Legislative Commentary to OEC 803(27), *reprinted in* Kirkpatrick, *Oregon Evidence* § 803.29[2], Art VIII-154 (4th ed 2002) ("The Legislative Assembly feels that

---

[7] The Legislative Commentary also implies that we are not free to adopt the "agency" or "language conduit" theory that the state advances. Although that theory does not create a hearsay exception, but posits that interpreted statements are not hearsay at all, meaning that OEC 802 would not preclude their admissibility, it seems clear that the legislature intended that it, rather than the courts, would develop Oregon's hearsay law. *See State v. Campbell*, 299 Or 633, 639, 705 P2d 694 (1985) ("[The Legislative Commentary to OEC 803(28)] reserved to the legislature the authority to fashion new exceptions to the hearsay rule and expressly circumscribed the authority of the judicial system to create categories of hearsay which will be admissible under the residual exception."). In any event, the decision to classify statements as hearsay or nonhearsay is a policy matter best addressed by the legislature.

the court in *Timber Access* went too far in admitting [a hearsay statement] under a general exception to the hearsay rule, and, to this extent only, intends to change Oregon law."). Consequently, we may not rely on the *Letterman* exception in this case.

■     The question remains, however, whether Lane's testimony was admissible under OEC 802. We conclude that it was. Although none of the exceptions in OEC 801 to 806 is directly applicable to statements made through an interpreter, OEC 803(28) provides a "catch all" or "residual" exception to the hearsay rule for statements "not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness * * *." The rule permits admission of the evidence only if the court finds the following:

> "(A)   The statement is relevant;
>
> "(B)   The statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts; and
>
> "(C)   The general purposes of the Oregon Evidence Code and the interests of justice will best be served by admission of the statement into evidence."

OEC 803(28)(a). The rule also imposes a procedural requirement:

> "A statement may not be admitted under this subsection unless the proponent of it makes known to the adverse party the intention to offer the statement and the particulars of it, including the name and address of the declarant, sufficiently in advance of the trial or hearing, or as soon as practicable after it becomes apparent that such statement is probative of the issues at hand, to provide the adverse party with a fair opportunity to prepare to meet it."

OEC 803(28)(b).

Defendant argues that Lane's testimony fails to meet three of the criteria for admissibility in OEC 803(28). He contends first that the testimony lacked circumstantial guarantees of trustworthiness because there is no evidence regarding Perez's qualifications as an interpreter. Next, he argues that Lane's testimony was not more probative than

any other evidence that the state could have procured because the victim herself could have testified about what she told Lane during that interview. Finally, defendant argues that the state failed to notify him of its intention to offer Lane's testimony about what Perez told him that the victim said during the interview.

We begin with the circumstantial guarantees of the trustworthiness of Perez's statements to Lane. We disagree with defendant's assertion that there is no evidence regarding his qualifications as an interpreter. Although there was no direct evidence of Perez's qualifications, there is ample circumstantial evidence indicating that his interpreting abilities were sufficient to make his statements reliable. Perez testified that Spanish was his first language, that he had been speaking both Spanish and English since he was a young child, and that he speaks Spanish "quite well."[8] In fact, he is employed as a bilingual tutor. He testified that he believed that he interpreted the interview accurately, and defendant did not cross-examine him on that point or any other. Perhaps most importantly, the trustworthiness of Perez's interpretation was established by the other evidence of the victim's story, particularly the victim's testimony, which was largely consistent with Lane's testimony about the interview. That consistency shows that Perez accurately interpreted the victim's statements during the interview. We conclude that, under the circumstances, the trustworthiness of Perez's interpretation was sufficiently guaranteed.[9]

We also conclude that Lane's testimony was more probative than any other evidence that the state could have

---

[8] Defendant notes that witnesses for both parties established that the ability to speak Spanish and the ability to competently interpret the language are distinct skills. That is certainly true, but the witnesses to whom defendant refers were addressing the interpreting abilities of persons who are not native Spanish speakers and, by their own admissions, are not proficient in the language. The testimony of the witnesses to whom defendant refers does not discredit Perez's interpreting abilities.

[9] Chief Judge Brewer's dissent focuses on Perez's formal qualifications as an interpreter, but it ignores what we regard as the more important indicators of the accuracy of Perez's interpretation: (1) the fact that Lane's testimony about what the victim said during the interview was largely consistent with the victim's testimony and (2) the fact that defendant did not challenge the accuracy of Perez's interpretation. In light of those facts, we fail to see the significance of the lack of evidence concerning whether Perez was trained or certified in interpretive technique.

adduced. Lane's testimony demonstrated that the victim had told essentially the same story seven months earlier that she told the jury at trial. Having the victim testify about what she recalled telling Lane would not have had the same effect. Although Perez himself could have testified as to the victim's statements during the interview, he did say, in his testimony at trial, that his recollection of his earlier discussion with her was "not exact." Lane, on the other hand, took notes during the interview from which he was able to refresh his memory about the details of what the victim said. Because Lane's testimony was likely to furnish the most precise rendition of the victim's statements during the interview, it was the most probative evidence available to the state on that point.

We turn next to defendant's assertion that the state failed to notify him of its intention to offer Lane's testimony about what Perez told him that the victim said during the interview. We disagree with defendant. As noted, OEC 803(28)(b) provides that a statement may not be admitted under that subsection unless the proponent of it "makes known to the adverse party the intention to offer the statement and the particulars of it, including the name and address of the declarant, sufficiently in advance of the trial * * * to provide the adverse party with a fair opportunity to prepare to meet it." In early May 2003, nearly two months before trial began, the state filed a notice of intent to offer statements under OEC 803(18a)(b), the hearsay exception for statements made concerning an act of abuse. The prosecutor's affidavit in support of that notice states that the prosecution provided defendant with "copies of all reports," copies of which were also attached to the affidavit. It states further that "the foregoing reports contain the particulars of the statements made by [the victim] that the state intends to offer[,]" and that "the reports contain the particulars of the statements made by [the victim] to * * * Charles Lane [and] Pedro Perez," among others.

One of the reports attached to the affidavit is Lane's police report. The second page of the report lists each person mentioned in the report along with an address and telephone number for each person. Perez is included in that list. The body of the report describes all of Lane's interactions with the

victim, defendant, and the other witnesses that he interviewed. In the portion describing his interview with the victim on December 9, 2002, Lane noted, "As she talked, Mr. Perez interpreted."

Although the state's notice indicated that the state intended to offer hearsay statements pursuant to OEC 803(18a)(b), the notice was sufficient to satisfy the requirements of OEC 803(28)(b) as well. It was clear that the state intended to offer the victim's statements to Lane, that those statements were made through interpreters, and that, in the December 9, 2002, interview, Perez was the interpreter. Thus, defendant was on notice that Lane would testify about what Perez told him the victim was saying during the interview.

Because Lane's testimony regarding the interview satisfied the requirements of OEC 803(28), his testimony was admissible. It follows that the trial court did not err in admitting it.

■ We turn to defendant's second assignment of error. Defendant argues that the trial court erred in failing to instruct the jury that at least 10 of its members had to agree on the particular facts that constituted the offense that it found him guilty of. Defendant contends that the evidence adduced at trial indicated that he touched the victim's vagina at least three different times: when he and the victim were playing cards, when his wife was sleeping in the bedroom, and when his wife was in Salem. He argues that a jury concurrence instruction—often referred to as a "*Boots* instruction"—was necessary to ensure that all of the jurors who voted to convict agreed on the same set of underlying facts. Defendant acknowledges that he did not preserve the asserted error by requesting such an instruction, but he argues that failure to give the instruction constitutes plain error, and he urges us to exercise our discretion to review it as such.

For crimes other than first-degree murder, Article I, section 11, of the Oregon Constitution requires the agreement of at least 10 members of the jury to render a guilty verdict.[10] At least 10 jurors must agree on the factual

[10] A verdict of guilty of first-degree murder must be unanimous. Or Const, Art I, § 11.

occurrences that constitute the crime, and it is error not to instruct the jury on "the necessity of agreement on all material elements of a charge in order to convict." *State v. Lotches*, 331 Or 455, 472, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001) (citing *State v. Boots*, 308 Or 371, 379, 780 P2d 725 (1989)). The Sixth Amendment to the United States Constitution similarly requires jurors "to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged." *United States v. Gipson*, 553 F2d 453, 457-58 (5th Cir 1977).

We conclude that the trial court did not err. Although the court did not *expressly* instruct the jury that a requisite number of the jurors must agree on the same set of underlying facts in order to return a conviction on any particular count, the information that the court gave to the jury adequately explained the requirement and left no room for doubt about precisely what the jury was required to do.

Early in the proceedings, the trial court informed the jurors that Count 7 in the indictment alleged "an act of similar nature" involving "sexual contact by touching [the victim's] vagina" on an "occasion separate and distinct" from the acts alleged in Counts 1 through 6. And when it instructed the jury on Count 7 after closing arguments, the trial court twice referred to the alleged crime as "the act."[11] Those references—"*the* act," which occurred on an occasion that was "separate and distinct" from other acts alleged—indicate that Count 7 referred to a single, particular event. (Emphasis added.)

In addition, the court gave the jury separate verdict forms for each count indicating the body part involved in the alleged abuse and instructed it that "ten or more jurors must agree upon your verdict. When you've arrived at a verdict, [the] presiding juror will sign the appropriate verdict form. Then at least ten of you that concur *in that verdict* will also sign it." (Emphasis added.) Thus, the court instructed the

---

[11] In describing the elements that the state was required to prove, the court stated, among other things, "One, that the act occurred in Lincoln County, Oregon. Two, the act occurred on or between December 1, 2001 and August 31, 2002."

jury that, to reach a guilty verdict on any given count, at least 10 jurors had to concur in that verdict.

Taking the indictment, the jury instructions, and the verdict forms together, the jury could not have been confused about the fact that, to convict defendant on Count 7, at least 10 of its members had to agree that, on a "distinct" occasion, defendant committed the act alleged in that count. It was clear to the jury that Count 7 corresponded to a particular factual incident. The indictment, jury instructions, and verdict forms together conveyed the same information that the concurrence instruction that defendant now calls for would have conveyed. In our view, giving such an instruction would not have added anything. It follows that the jury instructions, as given, were not erroneous.

Even if there were some chance that the jury misunderstood the concurrence requirement, we do not find this to be a case of plain error. It is not obvious that the facts on which the jurors might have disagreed are material elements of the crime, as opposed to "factual details" on which the jury is not required to agree. Assuming, for the sake of argument, that some of the jurors believed that defendant committed the crime on the night when his wife was asleep in the bedroom, others believed that the crime occurred when defendant's wife was in Salem, and still others believed that defendant was guilty of touching the victim the night they were playing the card game,[12] this case would nevertheless be controlled by *State v. Sparks*, 336 Or 298, 83 P3d 304, *cert den*, 543 US 893 (2004). In *Sparks*, the Supreme Court concluded that it was *not* plain error to fail to give a concurrence instruction even though—in that case, as in this one—there was evidence of more than one occasion when the defendant could have committed the sexual abuse in question. This case does not materially differ from *Sparks*.

*Sparks* was an aggravated murder case in which there was evidence that the defendant kidnapped the victim,

---

[12] The prosecutor told the jury in closing arguments that the incident on that night was not part of the charges, thus it is highly unlikely that the jury would have considered the facts related to the incident after the card game to be the basis for any of the charged crimes.

sexually abused her, and attempted to rape her.[13] One witness testified that he had seen the defendant with the victim in the defendant's trailer sometime between 8:30 p.m. and 12:30 a.m. on the night of the twentieth. Another witness testified that he had seen the defendant near the railroad tracks—where the victim was later found dead—sometime between 4:00 a.m. and 5:30 a.m. on the morning of the twenty-first. The defendant argued to the Supreme Court that the trial court should have given a jury concurrence instruction because the evidence presented at trial could have supported more than one "instance" of each of the underlying crimes, which "could have occurred at either, or both, of two distinct locations—[the] defendant's bedroom, where he first brought the victim, or the railroad embankment, where police found the victim's body." 336 Or at 313. In other words, some of the jurors might have believed that he committed the underlying offenses at his trailer but not at the railroad tracks, others might have believed that he committed them at the railroad tracks but not at his trailer, and still others might have believed that he committed the offenses at both locations. If that were the case, the jury would not have agreed unanimously on the set of facts for which the defendant should be convicted.

The Supreme Court concluded that there was no error apparent on the face of the record. In doing so, it first distinguished *Lotches* and *State v. Hale*, 335 Or 612, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004), where the court had found plain error. It noted that, in *Lotches*, there were multiple possible victims for each of the underlying crimes and, in *Hale*, there were multiple possible victims and two possible perpetrators of each of the underlying crimes. The *Sparks* court stated that "[i]t is not reasonably in dispute that a jury's failure to agree unanimously on either *the victim* or *the perpetrator* of the crime would violate the jury unanimity rule, because both those facts are material elements of the

---

[13] The defendant was charged with and convicted of 15 counts of aggravated murder, 14 of which were based on the underlying kidnapping and sex offenses. For example, three counts alleged, respectively, that the defendant had killed the victim "in the course of and in furtherance of" sexually abusing her, that he had killed her to conceal the commission of the sexual abuse, and that he had killed her to conceal his identity as the perpetrator of the sexual abuse. *Sparks*, 336 Or at 312-13.

underlying crimes." 336 Or at 316 (emphasis in original). It was not "obvious," however, that the jury's failure to agree on the location of the underlying crimes also violated the jury unanimity rule. *Id.* at 317. Instead, the court reasoned, the location of the crime more logically constituted a "factual detail" that did not require unanimity. *Id.* (citing *Boots*, 308 Or at 379). The court stated that "[t]he line between those facts that are essential to the crime and those that are merely factual details may not always be clear" and concluded that, because it was not clear on which side of that line the location of the crime falls, failing to give a jury concurrence instruction was not plainly erroneous. *Id.*

The only material distinction between the facts in *Lotches* and *Hale* and those in *Sparks* is that, in the former cases, each crime charged could have involved different victims or perpetrators whereas, in the latter, there was only one victim and one perpetrator associated with each count. For example, in *Lotches*, the defendant was charged with, among other things, one count of aggravated murder based on the underlying crime of attempted murder. There was evidence from which the jury could have concluded that the defendant committed the underlying crime more than once, but each incident involved a different victim. *Lotches*, 331 Or at 468. In *Sparks*, there was evidence from which the jury could have concluded that the defendant committed each of the underlying crimes more than once, but the same victim was involved each time. Because each crime could have occurred more than once, the jury may have failed to agree about which incident the defendant committed. Indeed, that is the very argument that the defendant made to the Supreme Court. *See Sparks*, 336 Or at 313 ("[D]efendant contends that the evidence presented at trial could have supported more than one instance of each of the five underlying crimes."). *Sparks*, then, appears to say that, if there is evidence of more than one incidence of a particular crime, as long as the same perpetrator and victim are involved in each incident, failing to instruct the jury that it must agree on the same set of underlying facts does not constitute plain error.[14]

---

[14] In his dissent, Chief Judge Brewer attempts to distinguish this case from *Sparks* by asserting that, here, "the jury may not have agreed unanimously as to *which* incident constituted which count," 210 Or App at 523 (Brewer, C. J.,

In this case, Count 7 involved one victim and one perpetrator. It follows that, in this case, as in *Sparks*, failing to give a jury concurrence instruction was not plainly erroneous.[15]

Finally, even if the failure to give such an instruction were plainly erroneous, we would exercise our discretion not to consider the error. *See State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990) (considering unpreserved error is a matter of discretion for appellate courts). The principle established in *Boots* had been in existence for well over a decade when this case was tried in 2003, and defense counsel also had the benefit of the Supreme Court's opinion in *Lotches*—decided in 2000. Had he raised an objection under either precedent, the trial court could easily have avoided any potential error by giving an express jury concurrence instruction. Furthermore, counsel may have had a tactical reason for not requesting a more specific concurrence instruction, particularly in light of the other efforts of the court to inform the jury that Count 7 referred to a discrete incident and that at least 10 of their number had to agree in order to convict on that count. *Cf. State v. Gornick*, 340 Or 160, 169, 130 P3d 780 (2006) (affirming the trial court's judgment after noting that the defendant could have chosen, for strategic reasons, not to object to the trial court action that he assigned as error on appeal).[16]

---

dissenting) whereas the jury in *Sparks* agreed as to "the crime charged in [each] particular count." *Id*. at 522 (emphasis in original). The dissent's assertion about *Sparks* simply does not accord with the facts of that case.

[15] The concurring opinion takes us to task for characterizing the fact that there may have been two separate acts of sexual abuse as a factual detail. 210 Or App at 513 (Edmonds, J., concurring). The concurring opinion does not account for the fact that, in *Sparks*, the location of the underlying crimes served to distinguish separate acts as well. If a crime could have occurred at either or both of two distinct locations, there could have been two separate acts, and, without a concurrence instruction, the jury may not have agreed on which act provided the basis for each underlying crime. The evidence pertaining to the timing of the sexual abuse alleged in Count 7 was no more essential to the jury's need to concur concerning that incident than was the jury's need in *Sparks* to concur as to whether the crimes underlying the aggravated murder occurred at night at the defendant's home or the following morning near the railroad tracks, or both. If the location of the acts is a factual detail, the timing of the acts must be a factual detail as well.

[16] Chief Judge Brewer asserts that he cannot imagine any tactical reason for not requesting a *Boots*-type instruction. We can. But first, the Supreme Court seemed satisfied in *Gornick* that the mere possibility of such a motive was a sufficient basis to find any error to be unqualified as "plain error." In any event, it is certainly possible that defense counsel did not want the court to direct the jury's

In his dissent, Chief Judge Brewer argues that the gravity of the error is "profound" because, "[w]ithout the proper instruction, the jury was not required to 'seriously [confront] the question whether they agree[d] that any factual requirement of [the offense had] been proved beyond a reasonable doubt * * *.'" 210 Or App at 527 (Brewer, C. J., dissenting) (quoting *Boots*) (brackets in original). Chief Judge Brewer further contends that, were we to fail to address it under these facts, there would be little room left for "*any* plain error review under *Boots*." 210 Or App at 528 (Brewer, C. J., dissenting) (emphasis in original). We respectfully disagree with Chief Judge Brewer's assessment of the gravity of the error. In light of the instructions and information that the trial court gave to the jury, it is very unlikely—if likely at all—that the jury did not understand that it had to agree on which facts the state proved. Consequently, any error in failing to give a concurrence instruction was not grave. For similar reasons, we also disagree that our decision leaves little room for any plain error review under *Boots*. Not every case arising under *Boots* will involve instructions and information like what was given to the jury in the case before us. There is no reason to assume that we would not exercise our discretion to correct a plain error where the gravity of the error is greater than it is in this case.

In sum, the trial court did not err in failing to give an express *Boots*-type instruction, because the instructions and information that it gave sufficiently apprised the jurors of the need for concurrence. Even if the court did err, under *Sparks*, the error was not plain and the likelihood of jury confusion was extremely low. Given that low likelihood and the ease with which defendant could have eliminated any chance of confusion, this would not be an appropriate case for excusing the failure to satisfy the preservation requirement. *See Gornick*, 340 Or at 166 ("'It is only in rare and exceptional cases that this court will notice an alleged error where no ruling has been sought from the trial judge.'" (Quoting

---

attention further to the number of times, or to the discrete instances in which, his client was alleged to have engaged in abusing this child. Asking for a *Boots*-type instruction would have emphasized the unpleasant facts, without adding any particular benefit to what the jury had already been told. Perhaps defense counsel thought that what did occur—acquittal on all but one count—was more likely if the jury did not get too organized in its deliberations.

*Hotelling v. Walther*, 174 Or 381, 385-86, 148 P2d 933 (1944).)); *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991) ("A court's decision to recognize unpreserved or unraised error in this manner should be made with utmost caution. Such an action is contrary to the strong policies requiring preservation and raising of error."). Thus, even if there were plain error, we would exercise our discretion not to address it.

Affirmed.

Haselton, Schuman, and Ortega, JJ., join in this lead opinion.

**EDMONDS, J.,** concurring.

The analysis of the issue of whether the trial court erred by not instructing the jury that 10 or more of its members must agree on the same set of underlying facts as to Count 7 of the indictment is informed by three Oregon Supreme Court cases: *State v. Lotches*, 331 Or 455, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001); *State v. Hale*, 335 Or 612, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004); and *State v. Sparks*, 336 Or 298, 83 P3d 304, *cert den*, 543 US 893 (2004). Unlike the lead opinion and Chief Judge Brewer's dissent, I do not believe that the holding in any of those cases is controlling in this case. I therefore write separately to explain my position.

The seminal case governing the above issue in this case is *State v. Boots*, 308 Or 371, 780 P2d 725 (1989). In that case, the defendant was charged with aggravated murder based on two separate subsections of the aggravated murder statute. The trial court affirmatively instructed the jury that the law did not require it to agree unanimously on either theory so long as all jurors agreed that the state had proved some combination of one or both of the alleged aggravating factors. The Supreme Court held that the instruction given by the court was erroneous because it relieved the jury from confronting the question of whether elements of either theory had been proved beyond a reasonable doubt. 308 Or at 375.

*Lotches, Hale,* and *Sparks*, cases that followed *Boots*, all shared one common characteristic: the defendant in each case argued on appeal that the trial court should have

instructed the jury that it had to agree unanimously on the same underlying crime to find the defendant guilty of aggravated murder as charged in a particular count and, because the defendant had not objected to the jury instructions in that regard in the trial court, the defendants asked the court to exercise its discretion to review the claimed error as error apparent on the face of the record.

In *Lotches*, the state charged the defendant with three counts of the aggravated murder of a single victim, based on underlying alternative counts of attempted first-degree robbery, attempted second-degree kidnapping, and attempted murder. The trial court did not instruct the jury that it had to agree on the same set of facts in order to convict the defendant on a particular count. The Supreme Court held that, although the defendant had not raised the claim of error at trial, the legal point was obvious because *Boots* had established that a jury must be instructed that it must agree on all material elements of a charge in order to convict. 331 Or at 472. The court concluded therefore that there existed error apparent on the face of the record. *Id.*

In *Hale*, the state charged the defendant with six counts of aggravated murder based on the underlying crime of sexual abuse and four counts of aggravated murder based on the underlying crime of murder. The trial court did not instruct the jury that it had to agree on the same facts to convict the defendant on a particular count. Based on its reasoning in *Lotches*, the court concluded that error apparent on the face of the record had occurred because, in part, error was obvious, *i.e.*, not reasonably in dispute. 335 Or at 627.

A different result, however, occurred in *Sparks,* where the Supreme Court affirmed the defendant's multiple convictions for aggravated murder and his death sentence. There, as in *Lotches* and in *Hale*, the trial court failed to instruct the jury that it had to agree on the same set of facts in order to convict the defendant on a particular count. On review, the defendant also argued that the trial court erred in failing to ensure jury unanimity on the charges of aggravated murder that were based on the underlying crimes of sexual abuse, kidnapping, and attempted rape. Specifically, the defendant pointed to evidence presented by the state that

each crime could have been committed either in the defendant's bedroom where he first took the victim or near the railroad embankment where the victim's body was found, or in both places. 336 Or at 312-13.

Although the *Sparks* court held that the first and third elements of the plain error doctrine were satisfied, it concluded that the legal point raised by the defendant was not "obvious" or error apparent on the face of the record. The court reasoned that it was not "obvious" that "a jury's failure to agree unanimously on the precise location where defendant may have perpetrated the underlying crimes against the single victim would violate the jury unanimity rule." *Id.* at 317. The court explained:

> "Nothing about the crimes charged in this case demonstrates that the precise location of the underlying crimes constitutes a material element of those crimes on which the jury must agree unanimously. In fact, the location of those crimes more logically constitutes a 'factual detail' that does not require jury unanimity. *Boots*, 308 Or at 379. The line between those facts that are essential to the crime and those that are merely factual details may not always be clear. However, defendant does not explain why the location of the underlying crimes constitutes a fact that the law makes essential to those crimes, as *Boots* discussed, and we cannot agree, without more, that defendant's legal proposition is 'obvious,' as this court applied that standard in *Hale* and *Lotches*."

*Id.*

The facts in this case differ significantly from the facts in *Boots*, *Lotches*, *Hale*, and *Sparks*. The indictment in this case charged defendant with committing one count of unlawful sexual penetration in the first degree (Count 1), one count of unlawful sexual penetration in the second degree (Count 2), eight counts of sexual abuse in the first degree (Counts 3 to 10), and one count of indecency (Count 11). Ultimately, defendant was acquitted on all counts except Count 7.

Before *voir dire*, the trial court read the indictment to the jury pool count by count. When the court came to Count 7 in the indictment, it told the prospective jurors:

"Count 7, same date, time, and place in question, but as an act of similar nature on *occasion separate and distinct* from the acts alleged in Counts 1 through 6 above, the defendant, on a date on or between December 1st, 2001 and August 31st, 2002 in Lincoln County, State of Oregon did unlawfully intentionally subject [the victim], a person under the age of 14, to sexual contact by touching her vagina, a sexual or intimate part of [the victim.]"

(Emphasis added.) The court made similar statements regarding Counts 8, 9, and 10. Each time, he told the jury that those counts were "separate and distinct from the acts alleged" in Counts 1 to 6.

After a jury was empaneled, the trial court gave the jury some precautionary instructions, including:

"Members of the jury, the law that applies to this case will be given to you in part in these precautionary instructions. After you have heard the evidence and the arguments of the attorneys, I will give you further instructions regarding the legal rules that you must follow in deciding this case.

"Your duty is to decide the facts from the evidence. You and you alone are the judge of the facts. You'll hear the evidence, decide the facts, then apply those facts to *the law that the Court will give you.* That's how you'll reach your verdict. * * *

"* * * * *

"The opening statements and the closing arguments of the lawyers are intended to help you understand the evidence, *although their statements and arguments are not part of the evidence.* * * *

"* * * * *

"After the opening statements, the evidence will be presented. At the conclusion of the evidence, the lawyers will make their closing arguments. *I'll then instruct you as to the law that applies to this case,* and you'll begin your deliberations."

(Emphasis added.)

At the end of the evidence in the case, the prosecutor made her initial closing argument. She told the jury, in part, that

"[t]he things that [the victim] told you concern two separate events. She told you—well, three. She told you about one time, after playing a Mexican card game, that the defendant fondled her in the hallway. That act does not constitute any of the charges.

"The scenarios that you're concerned with in this case are the time that [the victim] told you the defendant's wife went to Salem. That day she was touched, and that night she was touched, and those resulted in these charges down here in the bottom.

"[The victim] also told you about another time that she was on the couch watching television and the defendant fondled her, and those acts resulted in Counts 1 through 11,[1] and I've called that on here, 'The night the defendant dragged [the victim] to the kitchen.' Okay, because that's what she told Detective Lane[.] He covered her mouth and dragged her to the kitchen."

Later in her closing argument, the prosecutor told the jury, "The second set of charges, Count 7 through 10, all deal with the day that the defendant's wife went to Salem[.]"

After the parties finished closing arguments, the trial court completed its instructions to the jury. The court instructed the jurors that it was their "sole responsibility to make all decisions about the facts of this case" and that, "[w]hen I tell you what the law is on a particular subject, * * * you must follow the Court's instructions." Initially, in its final instructions, it told the jury:

"This being a criminal case, ten or more jurors must agree upon your verdict. When you've arrived at a verdict, presiding juror will sign the appropriate verdict form. Then at least ten of you that concur in that verdict will also sign it. * * * There are 11 verdict forms and you need to sign and return each of them."

After instructing the jury as to certain legal definitions pertinent to the charges, the court then turned to the charges themselves. As to each count, it instructed as to each element in each count, distinguishing the counts from each other and

---

[1] The prosecutor misspoke but later corrected herself.

telling the jury what the state was required to prove in order to prevail on that count.

It is axiomatic that jurors are presumed to have followed the court's instructions. *See, e.g., Holger v. Irish,* 316 Or 402, 420, 851 P2d 1122 (1993). When that presumption is applied to this case, it is apparent that no error occurred. Alternatively, even if error occurred, it is not error apparent on the face of the record. The record is clear that the jury was told that at least 10 of its number had to agree on each verdict form that was signed, that the court described the elements of each count and what the state was required to prove under those counts, and that the jury was informed by the court that Count 7 referred to an "act" on an "occasion separate and distinct from the acts alleged in Counts 1 through 6." Unlike in *Boots, Lotches,* and *Hale,* where the danger existed that the jury in each case did not agree on just what the defendant did to bring himself within the purview of the particular count with which he was charged, the jury was told in this case that Count 7 referred to "an act of similar nature on [an] occasion separate and distinct from the acts alleged in Counts 1 through 6." If it is presumed, as it must be, that the jury followed the instructions given by the trial court, then it necessarily follows that, when it rendered a verdict of guilty on the separate verdict form provided by the court for Count 7, the required number of jurors agreed on what defendant did to bring himself within the purview of that charge.

Nonetheless, according to the dissent, "[t]he jurors were not instructed that they had to agree as to which incident constituted which count." 210 Or App at 520 (Brewer, C. J., dissenting). But the argument on the record before us presents a different issue from the issue that existed in *Lotches* and *Hale.* Those cases are about the failure of a trial court to instruct *sua sponte* regarding the need for jury concurrence on a particular count where the state's charges are based on alternative theories of aggravated murder. This case involves allegations of two separate incidents in 10 counts, the "kitchen" incident and the "day defendant's wife went to Salem" incident. The danger addressed in *Boots, Lotches,* and *Hale* was that the jury may have considered the evidence fungible without concurring on a particular theory. But that danger does not exist where, as in this case, the trial

court identified Count 7 as referring to an incident on an "occasion separate and distinct from the acts alleged in Counts 1 through 6." Rather, when understood correctly, what defendant complains about in this case is the lack of an instruction telling the jury that Counts 1 through 6 referred to the "kitchen" incident and that Count 7 referred to the "day defendant's wife went to Salem" incident. But, if defendant thought that such an instruction was necessary because there was the potential for confusion as to which count applied to which incident, he could have asked for one. Because of the difference in issues between this case and *Lotches* and *Hale*, there was no *sua sponte* obligation on the part of the trial court to give a *Boots*-type instruction.

Chief Judge Brewer's dissent also asserts that "[t]his case presents substantially the same problem that existed in [*State v.*] *Houston*[, 147 Or App 285, 935 P2d 1242 (1997)]." 210 Or App at 520 (Brewer, C. J., dissenting). But in *Houston*, the defendant requested that the state elect a specific date as a basis for its delivery of a controlled substance charge, a request that the trial court denied. That denial was followed by a request from the defendant that the court instruct the jury that "there had to be a single occasion when all of the elements establishing the crime simultaneously occurred together at the same time and at least ten of your number must agree upon that occasion." 147 Or App at 288 (emphasis omitted). The trial court declined to give that instruction and, during the closing argument, the state argued to the jury that it had established "half a dozen incidents of delivery and that any of them would suffice to support a verdict of guilty." *Id.* Under the circumstances, we concluded that the same problem existed that had existed in *Boots* and therefore that the court had erred.

This case is unlike *Houston* in several ways. Here, defendant made no motion to require the state to elect a specific event as the basis for its charges, probably because it was understood by everyone which counts applied to which incidents. Also, as pointed out above, defendant requested no instruction on the subject of which counts applied to which incidents. Finally, unlike in *Houston*, the prosecutor in this case specifically told the jury which counts applied to which incidents rather than contending that any incident would

suffice to support a guilty verdict on the charge of delivery of a controlled substance.

The significance of the requirement of preservation should not be overlooked, particularly where different instructions and different legal theories are involved. In *Boots*, the court affirmatively instructed the jury that the required number of jurors did not have to agree on the manner in which the crime of aggravated murder was committed. On appeal, this court held that the claim of error regarding the instruction was properly preserved in the trial court. *State v. Boots*, 94 Or App 713, 717 n 4, 767 P2d 450 (1989). Similarly, the defendant in *Houston* preserved his claim of error in the trial court by moving to require the state to elect and by requesting that the jury be expressly instructed that 10 of its number had to agree on a particular incident. Here, unlike in those cases, even if there were error, defendant did not preserve any claim of error in the trial court that the jury was confused about which incident applied to which count.

Assuming, however, that there was error, defendant's lack of preservation of this issue in the trial court requires an analysis under ORAP 5.45. Under that construct, the cases that are most closely analogous to this case are *Lotches* and *Hale*. However, neither case involved the kinds of charges, instructions, and verdict forms that exist in this case, and therefore the plain error analysis in this case requires considerations that were not present in those cases. It suffices to say that I agree for the reasons expressed above and advanced by the lead opinion that any error in this case is reasonably in dispute and does not qualify as "obvious" or "plain error."

One point made in support of Chief Judge Brewer's conclusion regarding "plain error" deserves further comment. Chief Judge Brewer focuses, in part, on the fact that the prosecutor explained to the jury during closing argument that Counts 1 to 6 concerned a different incident from Counts 7 to 10. Relying on a statement in *Lotches* that the "prosecutor's arguments were not a legally sufficient substitute for necessary jury instructions[,]" 331 Or at 469, Chief Judge Brewer posits that, as a result, the purported shortcomings in the

trial court's instructions cannot be remedied by the prosecutor's explanation to the jury. 210 Or App at 524 (Brewer, C. J., dissenting).

That conclusion, however, fails to consider the context within which the prosecutor's statements took place in this case. In *Lotches,* the issue was whether the defendant committed murder in the course of robbery (Count I), kidnapping (Count II), or attempted murder (Count III). The aggravated murder instructions given by the trial court did not limit the jury's consideration to a specified underlying felony, and they did not require jury unanimity concerning the choice given to the jury among the alternative underlying felonies. The effect of those omissions created the same danger that the affirmative instruction in *Boots* had created—the danger that a verdict could be returned without the required number of jurors agreeing on the same factual circumstances. Based on its decision in *State v. Brown*, 310 Or 347, 356, 800 P2d 259 (1990) (holding that the arguments of counsel in the aggravated murder of a witness case could not supplant the need for the jury to be instructed about the required causal link between the murder and the victim's status as a witness), the *Lotches* court concluded that the prosecutor's arguments were not a legally sufficient substitute for the necessary jury instructions. 331 Or at 469. It followed, in the court's view, that the error in failing to give such instructions was "obvious" because

> "[i]t has been clear in Oregon, at least since *Boots*, that a jury must be instructed concerning the necessity of agreement on all material elements of a charge in order to convict. *The factual distinctions between the present case and Boots are not such that a court reasonably could doubt what its duties respecting jury instructions would be.*"

331 Or at 472 (emphasis added).

The prosecutor's arguments in this case, unlike in *Lotches* and in *Brown*, did not supplant jury instructions regarding the material elements of each count. Indeed, as recited above, the trial court expressly instructed the jury as to the material elements of each count, and the jury had been told previously by the trial court that Count 7 alleged "sexual

contact by touching [the victim's] vagina" on an "occasion separate and distinct" from the acts alleged in Counts 1 through 6. Because the trial court had already informed the jury of that difference in the allegations in the various counts, the prosecutor could properly argue to the jury how, in her view, the evidence produced by the state applied to each count. Because the prosecutor's closing argument was made within the legal framework provided by the court's instructions and because the jury was repeatedly instructed that it was to base its verdict on the facts that it found and the law as given to it by the court, it follows that the dissent's reliance on *Lotches* and *Brown* is misplaced.

Finally, I disagree with the lead opinion's conclusion that *Sparks* is controlling in this case. *Sparks* involves circumstances where the location of the crime was not essential to determining whether the state had proved the material elements of the underlying crime as a predicate to proving the charge of aggravated murder. In that case, the defendant argued with respect to certain counts that the trial court erred in failing to ensure jury unanimity on the charges of aggravated murder based on the underlying crime of sexual abuse. Specifically, he contended that the jury should have been instructed that it had to unanimously agree as to whether the sexual abuse occurred in the defendant's bedroom where he first brought the victim or the railroad embankment where the police found her body. However, in rejecting that argument, the *Sparks* court reasoned that the precise location of the sexual abuse was not material to any element of the crimes charged as *Boots* required and that "the location of those crimes more logically constitutes a 'factual detail' that does not require jury unanimity." 336 Or at 317. The *Boots* court explained the distinction between "factual details" and facts essential to the elements of the crime charged in the following terms:

> "If more than one way [of committing a crime] is charged and proved to the jury's unanimous satisfaction, the jury need not 'choose' and there is no difficulty. The problem arises precisely when none of the alternative ways has been proved to the satisfaction of all jurors, when one or more jurors is in doubt about each of the alternatives charged. We are not speaking here of factual details, such as

whether a gun was a revolver or a pistol and whether it was held in the right or the left hand. We deal with the facts that the law (or the indictment) has made *essential* to the crime."

*Boots*, 308 Or at 379 (emphasis added).

The test then under *Boots* concerns what facts the law or the indictment has made essential to the crime charged. In this case, the fact that the crime alleged in Count 7 concerned the day that defendant's wife went to Salem is an essential detail to the material elements alleged in Count 7 because that evidence separates Count 7 from Counts 1 to 6 and the incidents that underlie their allegations. For that reason, that evidence became essential to the jury determination of guilt under Count 7 and implicated the need for at least 10 jurors to agree concerning that factual incident. Consequently, the lead opinion errs when it characterizes that evidence together with its accompanying details as mere "factual details" for which no jury concurrence was required.

In summary, this case represents a different category of case than *Lotches*, *Hale*, and *Sparks*. *Lotches* and *Hale* are cases in which error for purposes of appeal was not preserved, but because of the similarity to *Boots*, the need of the trial court to give a jury unanimity instruction was apparent. *Sparks* represents a category of case that is distinguishable from the *Boots* line of cases because no unanimity of agreement is required for mere factual details that are not essential to the material elements of the crimes charged, *i.e.*, no error occurred in not giving a jury unanimity instruction, whether requested or not. This case represents a third category of case—different from *Boots*, *Lotches*, *Hale*, and *Sparks*—in that the trial court instructed and provided verdict forms in a manner that eliminated the danger that *Boots* addressed. But even if error occurred in this case under *Boots*, it is not "obvious error" under ORAP 5.45 because of the instructions and the verdict forms given by the court to the jury.

As to the other issues in this case, I agree with the lead opinion's reasoning.

For the above reasons, I concur with the lead opinion's result in this case but not with all of its reasoning.

**BREWER, C. J.,** dissenting.

The lead opinion holds that the trial court's failure to give the jury a specific concurrence instruction was not plainly erroneous:

> "Although the court did not *expressly* instruct the jury that a requisite number of the jurors must agree on the same set of underlying facts in order to return a conviction on any particular count, the information that the court gave to the jury adequately explained the requirement and left no room for doubt about precisely what the jury was required to do."

210 Or App at 497 (emphasis in original). I respectfully dise and, in addition, unlike the lead opinion, believe that this court should exercise its discretion to review and correct the error.

In closing argument, the prosecutor explained to the jury each of the charges in the indictment, using overhead slides. She stated:

> "The things that [the victim] told you concern two separate events. She told you—well, three. She told you about one time, after playing a Mexican card game, that the defendant fondled her in the hallway. That act does not constitute any of the charges.
>
> "The scenarios that you're concerned with in this case are the time that [the victim] told you the defendant's wife went to Salem. That day she was touched, and that night she was touched, and those resulted in these charges down here in the bottom.
>
> "[The victim] also told you about another time that she was on the couch watching television and the defendant fondled her, and those acts resulted in Counts 1 through 11,[1] and I've called that on here, 'The night the defendant dragged [the victim] to the kitchen.'
>
> "* * * * *
>
> "Then you have three counts here of Sex Abuse in the First Degree—I'm sorry, four counts of Sex Abuse in the First Degree. How do we divide this up? Touching the

---

[1] It seems likely that the prosecutor meant to refer to Counts 1 through 6 here because she followed this with a statement that Counts 7 through 10 related to the day that defendant's wife was in Salem.

breasts is sex abuse, and touching the vagina is sex abuse. Sex abuse in the First Degree can happen when a child is forced or when the child is under 14 years of age.

"So there's a count for the night when [the victim] was watching TV and she told you that the defendant touched her breasts, he touched her vagina, and then he inserted his finger or his hands inside her vagina.

"* * * * *

"The second set of charges, Count 7 through 10, all deal with the day that defendant's wife went to Salem, and [the victim] told you that the day that the defendant's wife went to Salem was the day that they were playing this game of locking each other outside of the house. And on that day, after she got back inside the house, her brother, Jose, went to take a shower, and the defendant followed her into her room and they fell onto the bed. She told Detective Lane he actually pushed her on the bed, but the end result was that she was laying on her back, and the defendant was on top of her and she couldn't get away, and he touched her breasts.

"Later that night she was watching television with the defendant before her brother and her father came home, although her younger brother, David, was there, and the defendant, at that time, touched her on her vagina. So there's a count of Sex Abuse in the First Degree—two counts of Sex Abuse in the First Degree for touching her breasts by force, and because she was under 14 years of age, and two counts of Sex Abuse in the First Degree for touching her vagina."

After closing arguments, the trial court instructed the jury, in part, as follows:

"This being a criminal case, ten or more jurors must agree upon your verdict. When you've arrived at a verdict, presiding juror will sign the appropriate verdict form. Then at least ten of you that concur in that verdict will also sign it. * * *

"* * * There are 11 verdict forms and you need to sign and return each of them.

"* * * * *

"And just for your benefit, when you get back in there and you look at [the verdict forms], it'll have Count 4, and in

parens it'll have her vagina. Count 5 will have—Count 5, and then in parens, her breasts. They're distinguished between the different counts by the act."

The verdict forms for Counts 4 and 7 were identical, each noting in parentheses that the count referred to "(touching her vagina and under age 14.)"

The court also instructed the jury as to the elements of each count. With respect to Count 7, the court stated:

"Count 7, Oregon law provides a person commits the crime of Sexual Abuse in the First Degree when the person intentionally subjects another person to sexual contact and the victim is less than 14 years of age. In this case, to establish the crime of Sexual Abuse in the First Degree, the State must prove, beyond a reasonable doubt, the following elements: One, that the act occurred in Lincoln County, Oregon. Two, the act occurred on or between December 1, 2001 and August 31, 2002. Three, [defendant] intentionally subjected [the victim] to sexual contact, and four, that [the victim] was less than 14 years of age."

The court gave an identical instruction with respect to Count 4. As the lead opinion observes, defendant took no exceptions to the instructions given, nor did he ask that the jurors be instructed that 10 or more of them must agree on the same set of underlying facts in order to convict defendant of any given count. The jury found defendant guilty on Count 7 and acquitted him of the remaining charges.

Defendant argues that the trial court erred in failing to instruct the jury that 10 of its members were required to agree on the same set of facts as the basis for convicting defendant of any particular count. Defendant notes that the state produced evidence that he committed sexual abuse against the victim in three different incidents—after the card game, on the night when the victim and defendant were watching television and family members were asleep in the next room, and on the day when the victim and defendant were watching television and defendant's wife and children were in Salem. Because the trial court failed to properly instruct the jury, he argues, the jury was "impermissibly allowed to base its verdict on alternative factual occurrences, each of which itself would constitute a separate crime."

According to defendant, the omission violated the jury consensus requirement embodied in Article I, section 11, of the Oregon Constitution.[2] Defendant concedes that the error was unpreserved at trial but argues that we should exercise our discretion to review it as error apparent on the face of the record.

This court has discretion to consider an error of law that is "apparent on the face of the record," even if that error was not raised at trial. ORAP 5.45(1); *State v. Pervish*, 202 Or App 442, 452, 123 P3d 285 (2005), *rev den*, 340 Or 308 (2006) (unpreserved instructional error not reviewable on appeal unless error is plain, that is, apparent on the face of the record). An error is "apparent on the face of the record" if (1) the error is one of law (2) the point of law is obvious, that is, not reasonably in dispute; and (3) the error is not one in which the court is required to go outside the record or select among competing inferences to find it. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). We determine as a matter of law whether each of those prerequisites is satisfied. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). At issue is the second element, that is, whether the point of law is obvious. I would conclude that it is.

The governing legal principle was first articulated by the Oregon Supreme Court in *State v. Boots*, 308 Or 371, 780 P2d 725 (1989). In *Boots*, the defendant was charged with aggravated murder based on two different aggravating factors: (1) that the homicide was committed in furtherance

---

[2] Although defendant cites the Sixth Amendment to the United States Constitution as the source of law for his argument, the primary authorities on which he relies were decided based on Article I, section 11, of the Oregon Constitution, and he gives no indication that a different analysis would apply under the United States Constitution. Accordingly, I understand defendant's argument to be premised on Article I, section 11, which states, in part, that "in the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict, and not otherwise[.]" *Cf. State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) (in determining whether error was preserved for appeal, raising an *issue* at trial is essential, identifying the *source* is less so, and making a particular *argument*, the third least); *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (questions of state law should be considered and disposed of before reaching federal constitutional claim); *State v. Phillips*, 138 Or App 468, 471 n 2, 909 P2d 882, *rev den*, 323 Or 114 (1996) (court's analysis was limited to federal law where, although defendant alleged a violation of the Oregon Constitution, both he and the state based their arguments on the federal constitution).

of a robbery and (2) that the homicide was committed to conceal the identity of the perpetrators of the robbery. *Id.* at 374. The trial court instructed the jury that it did not need to agree on the manner in which the murder was committed, that is, which of the alternative circumstances constituted the aggravating factor. *Id.* at 374-75. Analyzing the case under the jury unanimity requirements of the version of ORS 136.450 then in effect and Article I, section 11, the Supreme Court found error, concluding that each aggravating factor was an essential element of aggravated murder on which the jury must concur. The court in *Boots* found *United States v. Gipson*, 553 F2d 453 (5th Cir 1977), a case premised on the Sixth Amendment, to be persuasive, and stated:

> "Like the 'reasonable doubt' standard, which was found to be an indispensable element in all criminal trials in *In re Winship*, 1970, 397 US 358, 90 S Ct 1068, 25 L Ed 2d 368, the unanimous jury requirement impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue. The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged."

*Boots*, 308 Or at 380 (footnotes and internal quotation marks omitted). To convict, the court concluded, the jury must unanimously agree on the facts required by the statute that sets out the elements of the crime. *Id.* at 377. As the court observed, it is not "factual details, such as whether a gun was a revolver or a pistol and whether it was held in the right or the left hand," *id.* at 379, that the jury must agree on, but the "facts that the law (or the indictment) has made essential to a crime." *Id.*

Our later decision in *State v. Houston*, 147 Or App 285, 935 P2d 1242 (1997), illustrates how the *Boots* principle operates under facts more akin to those before us here. In *Houston*, the defendant was charged with one count of unlawful delivery of a controlled substance alleged to have been committed sometime during an eight-month period. At trial, the state presented evidence that the crime could have occurred at any of six different times. The trial court denied the defendant's motion to require the state to elect a specific date or event as the basis for the charge and also declined to

instruct the jurors that they must agree, by the same number as required for conviction, on a *particular* delivery as the basis for their verdict. *Id*. at 288.

We reversed, concluding that the trial court had erred, under *Boots*, in not giving the requested instructions or, alternatively, requiring the state to elect a specific basis for the charge. *Houston*, 147 Or App at 292. We distinguished *State v. King*, 316 Or 437, 853 P2d 190 (1993), a case in which the state, to support a charge of driving under the influence of intoxicants under ORS 813.010,[3] presented evidence that the defendant was driving with a blood alcohol content exceeding .08 percent under ORS 813.010(1)(a), and that the defendant was driving while under the influence of alcohol under paragraph (b) of the same statute. The court in *King* held that a concurrence instruction[4] was not required under those circumstances. The court reasoned that, as a matter of statutory construction, the individual paragraphs of ORS 813.010(1) did not set out essential elements of separate offenses as was the case in *Boots* but, instead, merely listed alternative methods of proving a single offense. *Id*. at 446. Those were not the circumstances in *Houston*. Rather, the problem in that case was that "the jury was allowed to base its verdict on alternative factual occurrences, *each of which itself would be a separate crime*." *Houston*, 147 Or App at 292 (emphasis added). It was not, as it was in *King*, merely a matter of the state adducing alternative *evidence* of a single factual occurrence. *Id*.

---

[3] ORS 813.010 (1993) provided, in part:

"(1) A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"(a) Has .08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under ORS 813.100, 813.140 or 813.150;

"(b) Is under the influence of intoxicating liquor or a controlled substance; or

"(c) Is under the influence of intoxicating liquor and a controlled substance."

[4] The *Boots* principle is not limited in application to aggravated murder cases, but is equally applicable where, as here, a less than unanimous verdict is required under ORS 136.450 and Article I, section 11, of the Oregon Constitution. *See, e.g., Pervish*, 202 Or App at 462. In such cases, the issue is one of concurrence of the required number of jurors, rather than unanimity. *Id*. at 449 n 3.

This case presents substantially the same problem that existed in *Houston*. The state charged defendant with four counts of first-degree sexual abuse relating to touching the victim's vagina. Although defendant was convicted of only one count, there was evidence of three different incidents in which defendant committed conduct constituting that crime. The jurors were not instructed that they had to agree as to which incident constituted which count. Thus, in convicting defendant on Count 7, various jurors may have concluded that defendant committed that crime either (1) when defendant and the victim were playing the card game; (2) when defendant and the victim were watching television and the family was asleep; or (3) when defendant and the victim were watching television while defendant's wife was in Salem. Without an appropriate concurrence instruction, the jury was impermissibly allowed to convict defendant without a requisite number agreeing on the specific act that was the basis for Count 7.[5]

Contrary to the state's and the lead opinion's views, later Supreme Court decisions reinforce that conclusion. I begin a review of those decisions with *State v. Lotches*, 331 Or 455, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001), where the defendant was charged with three counts of aggravated murder of a single victim, based on the murder having been committed during the course of an attempted robbery, during the course of attempted second-degree kidnapping, and in an effort to conceal the defendant's identity as the perpetrator of an attempted murder. The evidence presented at trial would have supported more than one charge of each of the underlying crimes because each act involved more than one victim. The jury instructions did not identify the particular victim or circumstances pertaining to any of the underlying crimes, and the court did not instruct the jury that it was required to agree on the same set of facts to convict the defendant of each count of aggravated murder. As a result, the jury was not

---

[5] The state attempts to distinguish *Houston* on the basis that it involved a single count proved by numerous instances, whereas this case involved multiple counts, with each count corresponding to a different incident. As elaborated below, that is not a legally significant distinction. *See Pervish*, 202 Or App at 462 ("The risk of confusion * * * applies equally to any crime that is pleaded in multiple counts where a jury is inadequately instructed as to which factual theories and evidence apply to which counts.").

required to agree unanimously on all of the facts required by a particular subsection of the aggravated murder statute—that is, the material elements of the crime—as required under *Boots*.[6] *Lotches*, 331 Or at 468-69. In analyzing the issue for plain error, the court concluded that the factual differences between the two cases were not so significant "that a court reasonably could doubt what its duties respecting jury instructions would be." *Id.* at 472.

The court next addressed this issue in *State v. Hale*, 335 Or 612, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004). In *Hale*, the defendant was convicted of 13 counts of aggravated murder relating to his and an accomplice's murders of three victims. Six of the counts alleged that the defendant had committed aggravated murder in an effort to conceal the commission of, or the identity of the perpetrator of, the underlying crime of third-degree sexual abuse; four were based on the underlying crime of murder. *Id.* at 624. The defendant argued that the trial court erred in failing to identify for the jury a particular incident of sexual abuse involving a particular victim and perpetrator or a particular incident of murder involving a particular victim, or to instruct the jury that it must agree unanimously on the same incident, as to each count. *Id.* The court agreed that the trial court had plainly erred in failing to instruct the jury that it must unanimously agree, from among the possible "alternative scenarios," regarding the factual circumstances of the underlying crime supporting each count. *Id.* at 627.

Most recently, in *State v. Sparks*, 336 Or 298, 83 P3d 304, *cert den*, 543 US 893 (2004), the defendant was charged with 15 counts of aggravated murder relating to the murder of a single victim. Fourteen of the counts were based on the defendant's alleged commission of underlying crimes: three were based on first-degree sexual abuse, three were based on first-degree kidnapping, three were based on second-degree kidnapping, three were based on attempted first-degree rape, and two were based on second-degree attempted rape. *Id.* at

---

[6] As the court explained, the jury could not properly have convicted defendant of aggravated murder based on attempting to conceal his identity as the perpetrator of attempted murder "if half the jurors thought that [the] defendant had attempted to murder [one victim] and half thought that he had attempted to murder [another]." *Lotches*, 331 Or at 468.

312-13. The defendant was convicted of all counts. On appeal, he argued that there was evidence establishing that each of the underlying crimes could have occurred at either or both of two distinct locations. It followed, the defendant argued, that the trial court was required, under Article I, section 11, of the Oregon Constitution and the Fourteenth Amendment to the United States Constitution, to instruct the jury that it must unanimously agree on the factual circumstances comprising each charged count.

The Supreme Court distinguished *Lotches* and *Hale* and declined to find plain error. The court agreed with the defendant that it is not reasonably in dispute that jury unanimity is required in aggravated murder cases. However, the court did not agree that the multiple factual theories presented in *Sparks* were analogous to those at issue in *Lotches* and *Hale*. The court noted that, in the latter cases, there were multiple possible victims and perpetrators of the alleged underlying crimes. In *Sparks*, however, there was only one victim, and the precise location at which the defendant committed the various underlying crimes was not a "material element" of any of those crimes. Accordingly, the court concluded that it was not "obvious" for plain error purposes whether the jury was required unanimously to agree as to such locations. *Sparks*, 336 Or at 317.

In summary, the facts in *Lotches* involved one perpetrator and one aggravated murder victim but multiple underlying crimes against multiple victims. *Hale* involved multiple perpetrators and multiple aggravated murder victims, as well as multiple underlying crimes against those victims. *Sparks* involved one victim, one perpetrator, and multiple underlying crimes against that victim. Nevertheless, the relevant distinction is not the number of perpetrators, victims, or crimes. Rather, the relevant distinction between *Lotches* and *Hale*, on the one hand, and *Sparks*, on the other, is that, in the former cases, the jury may have failed to agree on the particular incident underlying a particular count, including such material elements as the identity of the victim or perpetrator of that incident; whereas in *Sparks*, the jury, while agreeing as to the victim, the perpetrator, and the crime charged in a particular count, may have failed merely to agree about the location of that crime.

In relevant respects, this case is more like *Lotches* and *Hale* than *Sparks*. Here, although there was only one defendant and only one victim, defendant was alleged to have committed the relevant crime, first-degree sexual abuse, *on separate occasions*. Specifically, defendant was charged with four counts of sexual abuse relating to touching the victim's vagina, two of which were alleged to have occurred on one occasion and two of which were alleged to have occurred on a separate occasion. The jury convicted him of only one count. However, the evidence showed that there were at least three incidents of touching on which the jury could have based its verdict.

Thus, even though there was no possibility of confusion as to the perpetrator or victim of those crimes (as occurred in relation to the underlying crimes in *Lotches* and *Hale*), and even assuming that (as in *Sparks*) the locations at which the incidents took place were not material elements of the crimes, the jury may not have agreed unanimously as to *which* incident constituted which count. In other words, the problem in this case is that the jury might have failed to agree about which one of several alleged incidents—albeit differentiated, in part, by their locations—defendant committed. I would conclude that it is obvious that, under the latter circumstance, defendant was entitled to a jury concurrence instruction.

The state remonstrates that the assumption underlying *Boots*, *Hale*, and *Lotches*—"that when proof of multiple incidents, victims, or theories is funneled into a single charge or element, the jury assumes that that proof is fungible in determining whether the defendant is guilty"—is not applicable "in cases where each count corresponds to a different incident, and that is made clear to the jury," and, because of that, a concurrence instruction is not required. According to the state, because the prosecutor explained to the jury during closing argument the facts underlying each count, including that Count 7 pertained to defendant's conduct on the day his wife was in Salem, the trial court's instruction that 10 jurors must find defendant guilty beyond a reasonable doubt with respect to each individual count was sufficient. It follows, the state argues, that the jurors *were* in agreement on the facts in convicting defendant of Count 7.

The most immediate problem with the state's argument is that, without an appropriate concurrence instruction, it was *not* made clear to the jury that each count corresponded to a different factual incident and that a requisite number of them must actually agree on the same factual incident to return a conviction on any particular count. Nothing in the jury instructions or the verdict forms distinguished the various factual incidents by offense so that, in convicting defendant on Count 7, the jurors would understand the need for " 'substantial agreement as to just what a defendant did' " to be guilty of that particular offense. *Boots*, 308 Or at 380 (quoting *Gipson*, 553 F2d at 457-58).

Moreover, the Supreme Court has previously rejected the state's proposition that this shortcoming can be remedied by the prosecutor's explanation to the jury. *Brown*, 310 Or at 356; *Lotches*, 331 Or at 469. In *Lotches*, the state argued that any error that may have been committed with respect to the jury instructions was harmless, in part because the prosecutor clarified for the jury which counts were based on which factual occurrences, including the identity of the particular victims. The court disagreed, concluding that the "prosecutor's arguments were not a legally sufficient substitute for necessary jury instructions." 331 Or at 469. The court noted, as happened here, that " '[a]s is usually the case, the trial court cautioned the jury that what the lawyers argue is not evidence and that it is the court's function to instruct the jury as to the law.' " *Id.* (quoting *Brown*, 310 Or at 356). Thus, the state's argument is unavailing.

The lead opinion charts a course that parallels the state's tack. The lead opinion asserts that the concurrence requirement was satisfied in this case by the totality of information that the trial court provided to the jury. It is true, as the lead opinion points out, that "the trial court informed the jurors that Count 7 in the indictment alleged 'an act of similar nature' involving 'sexual contact by touching [the victim's] vagina' on an 'occasion separate and distinct' from the acts alleged in Counts 1 through 6." 210 Or App at 497. It is also true that, in instructing the jury on Count 7 the court referred to the alleged crime as the "act." However, that information did nothing to ensure that the jury understood that

the requisite number of them was required to have the *same* singular, particular event in mind when they convicted defendant of a specific count. Similarly, I do not see how providing the jury with separate verdict forms for each count, when the forms for Count 4 and Count 7 were indistinguishable, makes it any more certain that the jury understood the concurrence requirement.

Because it is unclear whether the jury concurred on the factual basis for defendant's conviction, the trial court's failure to instruct the jury that it must agree, by the requisite number, on the specific act that constituted a statutorily defined element of the crime at issue—in this case, the sexual contact—violated the jury concurrence requirement of Article I, section 11. The error is therefore apparent on the face of the record.

The concurrence, like the lead opinion, focuses on the trial court's instructions to the jury, relying in particular on the following admonitions: (1) the jury must follow the court's instructions, 210 Or App at 507 (Edmonds, J., concurring); (2) "at least 10 of its number had to agree on each verdict form that was signed," 210 Or App at 508 (Edmonds, J., concurring); and (3) "Count 7 referred to an 'act' on an 'occasion separate and distinct from the acts alleged in Counts 1 through 6,'" 210 Or App at 508 (Edmonds, J., concurring). Because the jury is presumed to have followed the court's instructions, the concurrence opines that "the required number of jurors agreed on what defendant did to bring himself within the purview of [Count 7]." 210 Or App at 508 (Edmonds, J., concurring). I respectfully disagree. Each juror could have followed each of the cited instructions and, yet, the requisite number of jurors might not have consciously concurred on the same incident in convicting defendant of Count 7. That is so because none of the cited instructions actually required them to so concur. The error defendant complains of is not, as the concurrence asserts, "the lack of an instruction telling the jury that Counts 1 through 6 referred to the 'kitchen' incident and that Count 7 referred to the 'day defendant's wife went to Salem' incident." 210 Or App at 509 (Edmonds, J., concurring). Rather, the error is that the jury

was not told that 10 of them had to agree on the same particular incident of sexual contact, from among evidence of several such incidents, as the basis for their verdict on each count. *See Houston,* 147 Or App at 293.

The "10 or more must agree" instruction is commonly given in criminal cases and does not cure the error. *See* UCrJI 1013; *Pervish,* 202 Or App at 451 n 6. Although the Supreme Court saw no need to mention it, the equivalent of that instruction was given in *Boots,* and it did not make a difference.[7] That is so because the touted instruction merely tells a jury how many must vote for a verdict, not whether that number must agree on a particular act. An analogous shortfall inheres in the "separate and distinct" occasion instruction on which the concurrence, like the lead opinion, relies.

The concurrence also attempts to distinguish *Houston*; it cites three differences between the circumstances of that case and the present case. The first two differences, that defendant made no motion to elect nor did he seek a specific concurrence instruction, merely show that, unlike in *Houston,* the error in this case was not preserved. Although those procedural differences exist, there is nothing inappropriate about relying on cases in which a pertinent legal principle was articulated, and the issue was properly preserved, to show that plain error of a similar kind occurred in another case in which the error was unpreserved. Indeed, it is, in part, precisely because the pertinent legal principle was articulated in *Houston* that the point of law is not reasonably in dispute in this case and thus a finding of plain error is appropriate. *See Lotches,* 331 Or at 472 (holding that the factual differences from *Boots* were not so significant "that a court reasonably could doubt what its duties respecting jury instructions would be"). As discussed, the third cited difference, that the prosecutor here "told the jury which counts applied to which incidents," is not material to the analysis. 210 Or App at 509-10 (Edmonds, J., concurring). The issue is

---

[7] In its brief before the Court of Appeals in the *Boots* case, the state noted that the trial court had instructed the jury that its "verdict on the charge of Aggravated Murder, or the lesser-included offense of Murder, must be a unanimous verdict. In other words, each and every one of you must agree on your verdict on either of those charges."

not whether the prosecutor's statements "supplanted" the trial court's instructions. Rather, they simply did not fulfill the function—either substitutionary or complementary—of qualifying instructions to the jury. *See Lotches*, 331 Or at 469.[8]

I next consider whether it is appropriate for this court to exercise its discretion to address the error. *Ailes*, 312 Or at 382. Among the nonexclusive factors that may guide our determination are

> "[t]he competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way[.]"

*Id.* at 382 n 6. In this case, the gravity of the error is profound. Without the proper instruction, the jury was not required to "seriously [confront] the question whether they agree[d] that any factual requirement of [the offense had] been proved beyond a reasonable doubt" as required by the Oregon Constitution. *Boots*, 308 Or at 375. The outcome might very well have been different if they had.

The lead opinion's reasons for refusing to exercise discretion to review the error, if plain, are unpersuasive to me. First, the fact that a competent defense lawyer should, after all these years, have sought a *Boots*-type instruction is beyond dispute; where the error is plain, that goes without saying. However, in my view, that observation furnishes no excuse for refusing to exercise our discretion to review plain error.[9] It is equally, if not more, appropriate to say that, after

---

[8] For good reason, the state does not contend that the prosecutor's statement constituted an election. To be effective, an election must be confirmed to the jury by the court. *See, e.g., State v. Bauer*, 183 Or 481, 482-83, 193 P2d 999 (1948) (holding that trial court erred in failing to instruct jury in accordance with state's election); *State v. Randolph*, 123 Or App 566, 568, 860 P2d 873(1993), *rev den*, 318 Or 382 (1994) (providing an example of how an election is confirmed by the court); *State v. Kibler*, 1 Or App 208, 211-12, 461 P2d 72 (1969) ("The court at the appropriate time correctly instructed the jury that the state was required to prove that the crime of concealment, if any, was committed on [the elected] date."). Because the prosecutor's statement was not the equivalent of an instruction by the court, the jury was free to disregard that statement.

[9] In *Pervish*, 202 Or App at 465, we specifically rejected the argument that, because the defendant failed to request an instruction or object to the instructions given, we should not exercise our discretion to correct the error.

all these years, trial courts should instinctively recognize that it is plain error to fail to give an appropriate concurrence instruction in circumstances such as existed in this case. Because the lead opinion declines to review plain error in this case, it leaves little room for *any* plain error review under *Boots*. Moreover, neither party has suggested that defense counsel might have had any tactical reason for not requesting a *Boots*-type instruction, and I cannot imagine one. We should not speculate that such a motive existed.[10]

In short, I would exercise discretion to address the error and, accordingly, would reverse defendant's conviction and remand the case for a new trial. As a result, I would not reach defendant's first assignment of error challenging the admissibility of Lane's testimony recounting what Perez told him the victim said during the December 9 interview. However, I note disagreement with the lead opinion's analysis of that issue in one significant respect. Like the lead opinion, I would find that the residual hearsay exception stated in OEC 803(28) governs in this case; unlike the lead opinion, however, I do not think that the requirements of the rule were met in this case. Specifically, I disagree with the lead opinion's conclusion that the "trustworthiness of Perez's interpretation was sufficiently guaranteed" to qualify for admission under the rule. 210 Or App at 494.[11]

The lead opinion finds that there was "ample circumstantial evidence indicating that [Perez's] interpreting abilities were sufficient to make his statements reliable." 210 Or App at 494. To the extent that the "ample circumstantial evidence" relied on by the lead opinion includes evidence of Perez's bilingual abilities, I find it unpersuasive. Although Perez testified that he spoke Spanish and that he had been speaking both Spanish and English since he was a young

---

[10] For example, it would be a groundless insult to speculate that trial counsel intentionally failed to request a concurrence instruction in order to set up a claim for post-conviction relief based on inadequacy of counsel should defendant be convicted of one or more of the charged offenses.

[11] My disagreement with the lead opinion's conclusion would not necessarily lead me to decide that the error in admitting Lane's testimony was reversible error. The state alternatively argues that, even if the admission of that testimony was erroneous, the error was harmless. The state may be right about that. In any event, because I would reverse on defendant's second assignment of error, I do not find it necessary to address the harmless error issue.

child, proficiency in speaking two languages does not necessarily correspond with interpreting ability. Nor does Perez's experience as a bilingual tutor necessarily shed any light on his interpreting abilities. Interpreting requires a special set of cognitive skills:

> "An interpreter must listen to what is being said, comprehend the message, abstract the entire message from the words and the word order, store the idea, search his or her memory for the conceptual and semantic matches, and reconstruct the message (keeping the same register or level of difficulty as in the source language). While doing this, the interpreter is speaking and listening for the next utterance of the language to process, while monitoring his or her own output."

Cathy Rhodes, *Court Certification*, 1 Access to Justice Journal 1, 2 (Summer 1999). For the purposes of providing interpreters to non-English-speaking persons in the courts, ORS 45.275(9)(c) defines "qualified interpreter," in part, as someone who can "orally transfer the meaning of statements" and interpret "in a manner that conserves the meaning, tone, level, style, and register of the original statement, without additions or omissions."[12]

In this case, there was *no* evidence of Perez's competence in performing such functions. He did not indicate that he had any training or experience in that area, or even that he understood what was expected of him in the role of interpreter. The record also does not disclose the method that was used by Perez to interpret the victim's statements.

Professional interpreters commonly use one of two interpretative methods: simultaneous or consecutive. In simultaneous interpretation, the speaker does not stop or

---

[12] Interpreters appointed by the court must be *at least* qualified. ORS 45.288. If one is available, the court generally must appoint an interpreter who is both qualified and certified. *Id.* Certification in Oregon requires, among other things, taking and passing a written English proficiency exam; a translation test for general vocabulary; an oral interpreting exam that includes a simultaneous interpreting component, a consecutive interpreting component, and a sight-interpreting component; and a written ethics exam. Oregon Judicial Department, Office of the State Court Administrator, *Certified Court Interpreter Information*.

pause, but continues to talk without interruption. The interpreter therefore conveys a virtually simultaneous interpretation of the words while the speaker is still talking. *See Oregon Judges Criminal Benchbook* 1014 (2005). In consecutive interpretation, the interpreter transfers the questions asked of the non-English-speaking person from English into the person's primary language after each question is asked and, then, interprets the person's response into English after the person responds.[13] *Id.* There is nothing in the record to indicate that Perez used either of these methods. It is possible that he summarized or paraphrased the victim's statements instead. When asked whether he had accurately translated the conversation, Perez responded only, "I think so. I think it's—yeah, as far as I—as far as I know." I simply would not set the bar so low.

I respectfully dissent.

Landau and Armstrong, JJ., join in this dissent.

**WOLLHEIM, J.,** dissenting.

I agree with the lead opinion's analysis and conclusion regarding defendant's second assignment of error concerning the trial court's error in failing to instruct the jury that at least 10 of its members had to agree on the particular facts that constituted first-degree sexual abuse (the *Boots*-type instruction). *See* 210 Or App at 496-503. Nonetheless, I dissent because I agree with Chief Judge Brewer's analysis regarding defendant's first assignment of error concerning the admission of Lane's testimony recounting what Perez told Lane that the victim said during the December 9 interview. *See* 210 Or App at 528-29 (Brewer, C. J., dissenting). However, unlike Chief Judge Brewer, and because I agree with the lead opinion's conclusion regarding the *Boots*-type instruction, I would reach the issue raised by the first assignment of error. The trial court erred in admitting Lane's testimony because the requirements of OEC 803(28) were not

---

[13] Even in consecutive interpretation, "[t]he interpretation is complete and accurate, but not verbatim. For example, 'red herring' translated into Spanish verbatim is 'red fish' and does not have the same meaning as 'red herring.' One correct interpretation [of the term] is 'false lead.'" *Oregon Judges Criminal Benchbook* at 1014.

met. Accordingly, I would reverse defendant's conviction and remand the case for a new trial.

I respectfully dissent.